ROSE F. LUZON (SBN 221544)
VALERIE CHANG (SBN 295147)
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
11755 Wilshire Blvd.
Los Angeles, CA  90025
Telephone: (310) 479-0944
Facsimile: (866) 300-7367
Email: rluzon@sfmslaw.com
Email: vchang@sfmslaw.com

STEPHEN J. FEARON, JR.
**SQUITIERI & FEARON, LLP**
32 E. 57th St., 12th Floor
New York, NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com

*Attorneys for Plaintiffs and the Proposed Class*
[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE VALDEZ and CECILIA VALDEZ, on behalf of themselves and as representatives of the Class, | Case No.: 2:14-cv-03595-CAS(MANx) |
| Plaintiffs, | |
| v. | **Amended Class Action Complaint and Demand for Jury Trial** |
| SAXON MORTGAGE SERVICES, INC., DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for the Registered Holders of Morgan Stanley ABS Capital I Inc. Trust 2007-NC3 Mortgage Pass-Through Certificates, Series 2007-NC3, OCWEN LOAN | |

SERVICING, LLC, and AMERICAN
SECURITY INSURANCE COMPANY,

Defendants.

1.  Plaintiffs, Shane Valdez ("Mr. Valdez") and Cecilia Valdez ("Ms. Valdez") (collectively, "Plaintiffs"), on behalf of themselves and all other persons who have or had a residential mortgage loan or line of credit owned, originated, and/or serviced by Defendants, Saxon Mortgage Services, Inc. ("Saxon"), Deutsche Bank National Trust Company, as Trustee for the Registered Holders of Morgan Stanley ABS Capital I Inc. Trust 2007-NC3 Mortgage Pass-Through Certificates, Series 2007-NC3 ("Deutsche Bank"), or Ocwen Loan Servicing, LLC ("Ocwen"), secured by property located in California and were charged for "force-placed" hazard insurance policies provided by Defendant, American Security Insurance Company ("ASIC") and/or other force-placed insurance providers on the secured property, allege, on personal knowledge as to all facts related to themselves and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

2.  Plaintiffs and the other class members (as defined below) have or had loans or lines of credit owned, originated, and/or serviced by Deutsche Bank, Ocwen, and/or Saxon (collectively, the "Servicing Defendants" and, together with ASIC, "Defendants") secured by their residential property and were required to pay for "force-placed" hazard insurance from ASIC, one of its affiliates, and/or other force-placed insurance providers, pursuant to agreements that return a financial benefit to Servicing Defendants or their affiliates that is unrelated to any contractual or other *bona fide* interest in protecting the lender's interest in the loan, which resulted in unauthorized and unfairly inflated costs to borrowers, in violation of their loan agreements and the law.

3.  By this lawsuit, Plaintiffs are not challenging the force-placed

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

insurance rates as excessive, nor are they challenging Servicing Defendants' right to force-place insurance. Plaintiffs' challenge is to Defendants' practice of purchasing and providing force-placed insurance pursuant to illicit and self-serving agreements that, among other things, involved ASIC and/or other insurers paying kickbacks and other undue compensation to Servicing Defendants in exchange for their force-placed insurance business, to the detriment of Plaintiffs and class members.

4.   In the event that borrowers fail to maintain their hazard insurance policies, rather than attempt to maintain delinquent borrowers' existing policies, mortgage loan lenders and/or servicers choose to replace borrowers' insurance policies with more expensive ones, known as "force-placed" or "lender-placed" insurance ("FPI" or "LPI") policies. Such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to lenders/servicers and/or their affiliates.

5.   Upon information and belief, Servicing Defendants exploited their contractual authority to force-place insurance in order to reap additional and unjustified profits in the form of fees, commissions, rebates, ceded reinsurance premiums and other forms of consideration at the expense of borrowers whose hazard insurance was force-placed. These improper fees and charges were not legitimately related to the cost of the FPI or the purposes for which FPI is purchased—to protect the lender's interest in the property. Nor were these improper fees and charges disclosed to, or authorized by, borrowers whose insurance was force-placed, including Plaintiffs and class members.

6.   Lenders and servicers like Deutsche Bank, Ocwen, and Saxon have manipulated the FPI process by making secret agreements with insurance companies to receive kickbacks for force-placing policies with those companies. Furthermore, upon information and belief, Servicing Defendants and ASIC and/or

other insurers have together, throughout the Class Period, engaged in a scheme, pattern and practice of demanding that borrowers maintain hazard insurance for their property in amounts greater than required by their mortgage agreements and greater than Servicing Defendants' financial interest in their property, without any reasonable basis or justification.

7.   Such force-placed policies provide less coverage and are substantially more costly to borrowers than the borrowers' original policies due to the pervasive incentives and lucrative financial benefits that are shared between Servicing Defendants and ASIC and/or other insurers, which are unrelated to the provision of FPI.

8.   The charges paid by and/or assessed to Plaintiffs and members of the class include amounts not attributable to the cost of providing FPI but, instead, are expenses associated with servicing *all* the loans serviced by Servicing Defendants. Furthermore, lenders and loan servicers have outsourced such portfolio monitoring and tracking services to force-placed insurance providers such as ASIC, at below market rate. Consequently, Defendants have acted in conspiracy with each other so that the small percentage of borrowers who pay for FPI shoulder the costs of monitoring the lender or servicer's entire loan portfolio—resulting, effectively, in a kickback to the servicers and the enrichment of the servicers at borrowers' expense. *See* Testimony of Birny Birnbaum on Behalf of the Center for Economic Justice for the Florida Office of Insurance Regulation dated July 3, 2012, attached hereto as Exhibit 1 ("Birnbaum Florida Testimony").

9.   Furthermore, Servicing Defendants and ASIC conspired to charge borrowers for more FPI coverage than required or permitted.

10. In this action, Plaintiffs challenge Servicing Defendants' practice of purchasing FPI from a provider pursuant to agreements that return a financial benefit to Servicing Defendants that is unrelated to any contractual or other *bona*

*fide* interest in protecting the lender's interest in the loan, and which results in unauthorized, unjustified and unfairly inflated charges to the borrower for FPI, in violation of law.

11. Birny Birnbaum, on behalf of the Center for Economic Justice, found that:

> The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms to Fannie Mae. Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down. In addition, Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services (to the extent that insurers are providing such services).

*Id.*

12. As one journalist observed of the industry:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions.

> Policies are sometimes backdated to cover periods that have already passed. In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that.

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, STAR-TELEGRAM (Oct. 1, 2011), attached hereto as Exhibit 2.

13. Recently, regulatory authorities around the country have started to investigate the FPI practices of lenders and servicers, including Ocwen and Saxon, as well as insurance companies, including Assurant, Inc, (ASIC's parent company). For example, the New York State Department of Financial Services ("NYSDFS") convened hearings in 2012 to investigate the FPI industry. On the opening day of these hearings, NYSDFS Superintendent Benjamin Lawsky noted that its department's initial inquiry uncovered "serious concerns and red flags" which included: (a) exponentially higher premiums for force-placed insurance than regular insurance; (b) extraordinarily low loss ratios; (c) harm to distressed borrowers; (d) lack of competition in the market; (e) increased reliance on FPI as a major profit center for both banks and insurers; and (f) "tight relationships between banks, their subsidiaries and insurers." *See* Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services (May 17, 2012), attached hereto as Exhibit 3.

14. These 2012 hearings investigated the FPI practices of banks and mortgage loan servicers, including Ocwen and Saxon, and FPI providers, including ASIC. *See Under Interrogation,* AM. BANKER (Jan. 27, 2012, 5:03pm ET), http://www.americanbanker.com/news/force-placed-insurance-subpoenas-1046159-1.html, attached hereto as Exhibit 4.

15. Consumer advocates at these hearings stated that FPI usually costs the borrower three to 10 times the price of regular insurance and Mr. Lawsky noted that insurers paid an exceptionally low loss ratio of around less than 25 cents in claims for every dollar of premium they received. *See* Mary Williams Walsh, *New York Investigates Insurer Payments to Banks*, N.Y. TIMES (May 21, 2012), http://www.nytimes.com/2012/05/22/business/new-york-investigates-home-

insurer-payments-to-banks.html, attached hereto as Exhibit 5.

16. In response to these hearings, New York Governor Andrew M. Cuomo stated that his administration would continue to investigate the "lack of competition, high prices, and low loss ratios and take necessary steps to clean up this market." *Id.*

17. In addition, the National Association of Insurance Commissioners ("NAIC")—the lead national insurance regulatory organization created and governed by the chief insurance regulators from all 50 states that is charged with establishing standards and best practices, conducting peer reviews, and coordinating regulatory oversight—began investigating FPI practices and held public hearings on August 9, 2012 to look into the FPI practices of banks and their partners. *See* Mark E. Ruquet, *NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules*, PROPERTYCASUALTY360.COM (Aug. 10, 2012), http://www.propertycasualty360.com/2012/08/10/naic-promises-greater-focus-on-force-placed-insura, attached hereto as Exhibit 6.

18. Throughout the Class Period, Defendants have engaged (individually and in concert with one another) in unlawful, abusive and unfair practices with respect to FPI, including: (a) electing to purchase higher-priced insurance policies from ASIC and/or other insurers in exchange for payments from ASIC and/or other insurers; (b) forcing insurance on borrowers in breach of the contracts that Plaintiffs and the class had with their lenders; (c) forcing insurance on borrowers in amounts that exceed the limits imposed by the borrowers' loan documents and by law; (d) forcing borrowers to pay for duplicative insurance coverage; (e) forcing insurance on borrowers for time periods that had already passed; (f) improperly exploiting the ability to manage and gain access to escrow funds in order to increase profits to Servicing Defendants and ASIC; (g) forcing excessive insurance on borrowers arranged with ASIC and/or other insurers pursuant to an exclusive

purchasing agreement with Servicing Defendants; (h) charging members of the class unreasonably high amounts for force-placed insurance, inflated by expenses unrelated to the provision of the insurance and which result from collusion among Servicing Defendants, ASIC, and/or other insurers; (i) receiving fees, payments, commissions and other things of value from providers of hazard insurance; (j) misrepresenting that Servicing Defendants were requiring hazard insurance on class members' properties to secure Servicing Defendants' interests, and omitting that Servicing Defendants were force-placing insurance to benefit themselves by generating an unreasonable and unwarranted profit for each Defendant; (k) conspiring to take advantage of their contractual authority to force-place insurance on Plaintiffs and the class members in order to return an undisclosed and improper financial benefit to each Defendant, its affiliates and subsidiaries; (l) failing to inform Plaintiffs and class members that FPI practices did not only protect Servicing Defendants' interest in Plaintiffs' and class members' properties but also generated unwarranted profits for Defendants; and (m) tying the purchase of insurance to a requirement that borrowers effectively pay for the cost of monitoring their entire portfolio. These improper acts were neither disclosed to, nor authorized by, Plaintiffs and class members.

19. Defendants engaged in this conduct in bad faith, knowing that their actions were inconsistent with the contracts and mortgage documents, applicable law, reasonable commercial standards of fair dealing, and the reasonable expectations of borrowers upon originating their mortgages.

20. Based on Defendants' conduct as described herein, Plaintiffs assert claims for: (a) violating the California Business & Professions Code §§ 17200, *et seq.*; (b) breach of contract; (c) breach of the covenant of good faith and fair dealing; (d) unjust enrichment; and (e) declaratory and injunctive relief.

21. Plaintiffs assert these claims on behalf of themselves and a class

consisting of all persons who have or had a residential mortgage loan or line of credit serviced by Servicing Defendants, secured by property located in California and/or, in connection therewith, were charged for "force-placed" hazard insurance on the secured property obtained through ASIC and/or other insurers within the applicable statute of limitations (the "Class").

22. As stated above, Plaintiffs do not challenge the rates of their FPI provider as excessive nor Servicing Defendants' right to force-place insurance. Rather, Plaintiffs challenge, among other things and as further described herein, Servicing Defendants' *decision to purchase* force-placed hazard insurance from ASIC and/or other insurers pursuant to an exclusive agreement which imposed charges unrelated to the provision of force-placed insurance on borrowers who were force-placed, such that the prices far exceeded borrower-purchased insurance (while providing substantially less coverage), in order to provide a financial benefit to Defendants.

23. Plaintiffs and the Class seek injunctive relief, corresponding declaratory relief, monetary relief, and other appropriate relief for Defendants' unlawful conduct, as described herein.

## **RELATED ENTITY**

24. Assurant, Inc. ("Assurant") is a Delaware corporation headquartered in New York, New York. Assurant is a provider of specialty insurance products in the U.S. and select worldwide markets. *See* http://www.assurant.com/AboutAssurant (last accessed Oct. 9, 2014). Assurant has four operating segments—Assurant Solutions, Assurant Specialty Property, Assurant Health, and Assurant Employee Benefits. Assurant Executive Vice President, Gene Mergelmeyer, directs the FPI operations of Assurant through Assurant Specialty Property. Assurant is one of the two dominant providers of FPI in the United States.

## THE PARTIES

25.  Plaintiffs reside in Claremont, California and are members of the Class.

26.  Defendant, Saxon, is a Texas corporation with its headquarters in Fort Worth, Texas. During the relevant time period, Saxon was a residential mortgage servicer managing home loan payments and transactions for primarily non-prime home loans throughout the United States, including in California. Upon information and belief, Saxon ended the majority of its mortgage servicing operations in or around April 2012.

27.  Defendant, Deutsche Bank, as Trustee for the Registered Holders of Morgan Stanley ABS Capital I Inc. Trust 2007-NC3 Mortgage Pass-Through Certificates, Series 2007-NC3, is a banking institution chartered and supervised by the Office of the Comptroller of the Currency with its headquarters in New York, New York. Deutsche Bank is a leading provider of financial services to agencies, corporations, governments, private individuals and institutions. Deutsche Bank does business throughout the United States, including in California.

28.  Upon information and belief, Deutsche Bank is the current lender-in-interest to Plaintiffs' mortgage. *See* Substitution of Trustee, attached hereto as Exhibit 7 (naming "Deutsche Bank Trust Company Americas formerly known as Banker's Trust Company, as Trustee and Custodian for Morgan Stanley" as the beneficiary or lender of Plaintiffs' mortgage).

29.  Defendant, Ocwen, is a Delaware corporation with its headquarters in West Palm Beach, Florida. Ocwen is a subsidiary of Ocwen Financial Corp. and is one of the largest third-party servicers of subprime residential mortgage loans in the country.

30.  Defendant, ASIC, is a Delaware corporation with its principal place of business in Atlanta, Georgia, and is a subsidiary of Assurant that does business throughout the United States. ASIC writes FPI policies in all 50 states and the

District of Columbia. ASIC also provides services to the Servicing Defendants in relation to their FPI practices, including: (1) tracking a borrower's loan to determine the existence of hazard insurance; (2) placing FPI for Servicing Defendants when there has been a lapse; and (3) handling all customer service duties related to FPI. The FPI policies issued to Plaintiffs were underwritten by ASIC.

31. At all relevant times until on or about May 16, 2011, Saxon serviced Plaintiffs' Mortgage (defined below).

32. Since at least May 16, 2011, Ocwen has serviced Plaintiffs' Mortgage.

33. At all relevant times, Saxon's and Ocwen's conduct was approved, authorized, and/or ratified by Deutsche Bank.

## JURISDICTION AND VENUE

34. This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiffs are citizens of California and Defendants are citizens of different states. The amount in controversy in this action exceeds $5,000,000 and there are more than 100 members of the Class.

35. Defendants regularly conduct business in this District. Servicing Defendants owned, originated, and/or serviced Plaintiffs' and Class members' residential mortgage loans secured by property located in this District, and, in connection therewith, ASIC provided "force-placed" hazard insurance policies on such secured property.

36. A substantial portion of the events alleged herein occurred in California and in this District.

37. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiffs reside in this District, Defendants regularly conduct business in this District, and a substantial portion of the events giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

38. As a condition of funding borrowers' loans, mortgagees require borrowers to purchase and agree to maintain hazard insurance coverage on their secured property.

39. In order to ensure that the lender's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain the insurance. The amounts disbursed for the procurement of such insurance becomes additional debt secured by the mortgage.

40. The authority afforded the lender or third-party servicer to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage itself. Defendants routinely exceeded the bounds of reasonableness and the spirit, intent, and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's interests in the property and through other improper conduct described herein with respect to force-placing insurance.

41. Plaintiffs' and Class members' mortgage agreements do not disclose the nature of the commissions, kickbacks or reinsurance premiums that ASIC and/or other insurers funnel to Servicing Defendants for purchasing the insurance. The mortgage agreements do not disclose that this payment will be based upon a percentage of the cost of the premium of the FPI. Instead, the contracts misrepresent to borrowers that the cost of the FPI is necessary in order to protect the lender's interest in the secured property.

42. LPI or FPI policies are almost always more expensive than standard insurance coverage. Lender-placed policies can cost as much as ten times more than standard policies. While the FPI policy primarily benefits the lender, the excessive cost is passed on to the borrower. *See* Jeff Horowitz, *Ties to Insurers*

*Could Land Mortgage Servicers in More Trouble*, AM. BANKER (Nov. 9, 2010, 12:00pm ET), http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1, attached hereto as Exhibit 8 ("Ties to Insurers").

**Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain FPI Providers**

43. FPI programs have become a lucrative business for loan servicers and/or lenders. Commonly, the servicer and/or lender selects the provider through a pre-arranged agreement and force-places the policy in such a way as to receive an improper financial benefit. The servicer and/or lender benefits by placing the policy either: (a) with an affiliate; or (b) with a third party provider who has already agreed to share revenue with the lender and/or servicer in the form of a direct commission payment, subsidized portfolio monitoring and/or through "reinsurance" premiums that are ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

44. Under the direct payment arrangement, the provider of the FPI policy pays a portion of the premium collected either directly to the servicer or to a subsidiary posing as an insurance "agent" in the form of commissions or as a "reimbursement" of the servicer's "incurred expenses" related to force-placing the insurance.

45. On information and belief, Servicing Defendants, during the relevant time period, had such an arrangement with ASIC and other insurers.

46. Under the captive reinsurance arrangement, the provider of the FPI policy agrees to "reinsure" the FPI policy with a subsidiary or "captive reinsurer" of the referring servicer. In return for the subsidiary's agreement to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of

the premiums received on account of the policy.

47. Illustrative of these typical kickback arrangements is the following graphic from *American Banker*:

# Sharing in the Profits
How servicers make money arranging force-placed coverage

**Commissions**

To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer



Servicer advances premiums to insurer

Insurer pays portion of premium back to subsidiary as a commission



Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale



**Reinsurance**

To replace lapsed coverage, servicer buys policy on home from insurer

Servicer advances premiums to insurer

Subsidiary of servicer reinsures part of the policy, gets a cut of premiums

If necessary, subsidiary buys letter of credit from another party

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

48. An experienced and noted expert in the area of FPI, Birny Birnbaum of the Center for Economic Justice, testified:

> Servicers have financial incentive to force-place the insurance because the premium includes commission and other consideration for the servicer. With some servicers, the insurance is reinsured through a captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

*See* Birnbaum NYSDFS May 21, 2012 Testimony ("Birnbaum NYSDFS

Testimony"), attached hereto as Exhibit 9.

49. Borrowers have no say or input into the carrier or terms of the FPI policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

50. For their part, servicers have no incentive to comparison shop for the best rate. Rather, servicers are financially motivated to refer borrowers to the provider that will give the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums. As the servicer's "commission" (*i.e.*, kickback) and/or reinsurance premium is usually related to the size of the policy, the servicer actually has an incentive to purchase the *highest* priced insurance, an interest diametrically opposed to that of the borrower.

51. Commonly, a mortgage loan servicer enters into an agreement with an insurance provider pursuant to which it refers borrowers exclusively to the provider for FPI.

52. FPI policies are not underwritten on an individual policy basis. Rather, servicers' contracts with FPI providers, such as Assurant and Balboa or their subsidiaries, require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

53. As J. Robert Hunter testified recently before the New York Financial Services Department, "[the] lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Hunter NYSDFS Testimony, at 5, attached hereto as Exhibit 10.

54. Servicers often go so far as to actually outsource their insurance processing to the FPI provider. The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the event that borrowers do not maintain adequate

insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these servicers receive commissions from FPI providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral. *See* Jeff Horowitz, *Ties to Insurers* (Exhibit 8).

55. While mortgage servicers like Ocwen and Saxon profit greatly from force-placing insurance, on information and belief, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of FPI.  However, according to an article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year." *See* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, AM. BANKER   (Mar.   10,   2011,   12:25pm   ET),   *available   at* http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html (noting that servicers demand generous commissions and other payments in return for their referrals), attached hereto as Exhibit 11 ("Horowitz Article").

56. "The incentives and potential for abuse in the administration of LPI [lender placed insurance] are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the servicer from the force-placement of the coverage." *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, before the U.S. House of Representatives Subcommittee on Insurance,   Housing   and   Community   Opportunity   Committee   on   Financial

Services, attached hereto as Exhibit 12.

57.     In addition, "[t]he prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%.  Incredibly, lenders get a commission – totaling hundreds of millions of dollars – out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral. The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance – so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic] insurance." *Id*.

58.     Servicers commonly attempt to justify the high price of FPI policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry – even after accounting for the generous commissions and other payments that servicers demand.

*See* Horwitz Article (Exhibit 11).

59.     Direct "kickbacks" are also part of the process. "The insurance company that issued the [Homeowner's] new forced place insurance told ABC News that it generally pays Chase a 15 percent commission on such policies." *See* Chris Cuomo and Gerry Wagschal, *Insurance Frustration: Family on Brink of Losing Home Get Mortgage Relief Following ABC News Report,* ABC NEWS (Mar. 10, 2010), http://abcnews.go.com/TheLaw/abc-world-news-homeowners-angry-expensive-fixed-place-insurance/story?id=9919670, attached hereto as Exhibit 13.

60.     Servicers also attempt to blame the exorbitant cost of FPI on the fact

that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting. *Id*.

61. As Birny Birnbaum of the Center for Economic Justice testified, servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence." Loss ratios have been historically low. *See* Birnbaum Florida Testimony (Exhibit 1).

## Defendants Charge Borrowers for Unnecessary Insurance

62. Unnecessary or inappropriately priced hazard insurance arises when a servicer forces borrowers to purchase and maintain hazard insurance for their property that is unnecessary, duplicative, or in amounts greater than required by law or their mortgage agreements.

63. Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Defendants commonly require borrowers to pay for unnecessary insurance coverage. Such examples include, without limitation: (a) backdating FPI policies so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for worthless retroactive coverage for periods of time during which the lender or servicer knew or easily could have known that no loss occurred; and (b) requiring borrowers to pay for FPI policies covering periods of time following a lapse of previous insurance, despite the fact that the lender's interest in the property was covered for such time pursuant to either a "standard mortgage clause," or, upon information and belief, a "Lender's Loss Payable Endorsement" in the previous policy, both of which provide all necessary and contractually required protection for mortgage lenders by automatically extending insurance coverage for a certain

period after any homeowner insurance policy has lapsed or ended.

64.     It is unreasonable and unjustified to backdate force-placed hazard insurance policies. The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature." Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper and unlawful. *See, e.g.*, Ties to Insurers, *supra* (quoting the NAIC as stating that insurance policies "should not be back-dated to collect premiums for a time period that has already passed") (Exhibit 8).

**The Origination of Plaintiffs' Mortgage**

65.     In January 2005, Plaintiffs bought a house at 511 Clarion Place, Claremont, California (the "Property"), for $500,000. To fund the purchase, Plaintiffs obtained a loan from WMC Mortgage Corp. ("WMC") in the amount of $500,000 secured by a deed of trust on their Property.

66.   On or about February 23, 2007, Plaintiffs refinanced their mortgage and executed a Deed of Trust with New Century Mortgage Corporation ("New Century") in the amount of $592,000 ("Mortgage"). A copy of the Mortgage is attached hereto as Exhibit 14.

67.   Under the Mortgage, Plaintiffs were required to maintain hazard insurance coverage on the Property serving as collateral for the loan. In the event that coverage of the Property is not maintained, the "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]" *See* Mortgage, ¶¶ 5, 9.

68.   As detailed in paragraphs 5 and 7 of Plaintiffs' Mortgage:

> **5.  Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included

within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the period that Lender requires. . . . If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. . . . Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.

\*　　\*　　\*

**9.　Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is <u>reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument</u> . . . . Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. (Emphasis added.)

69. Upon information and belief, and based on the fact that Plaintiffs' Mortgage is a Fannie Mae/Freddie Mac mortgage, the relevant terms of Plaintiffs' Mortgage and the mortgages of Class members are substantially the same.

70. Pursuant to the requirements of their Mortgage, Plaintiffs maintained their own hazard insurance on the Property throughout the duration of their Mortgage until in or around 2008, at a total policy premium amount of approximately $973 per year through Farmers Insurance ("Farmers").

71. On or about February 23, 2007, Plaintiffs entered into a second deed of trust ("Second Mortgage") with New Century secured by their Property. The Second Mortgage was for the total amount of $148,000.

**Defendants Charged Plaintiffs for FPI Pursuant to Lucrative Pre-Arranged Agreements**

72. In January 2005, Plaintiffs obtained a mortgage loan from WMC in the amount of $500,000 secured by a mortgage on their Property.

73. On February 23, 2007, Plaintiffs refinanced their Mortgage and executed the Mortgage with New Century in the amount of $592,000 secured by a deed of trust on their Property. *See* Mortgage (Exhibit 14).

74. That same day, Plaintiffs executed the Second Mortgage for $148,000 secured by a deed of trust on their Property.

75. Upon information and belief, Saxon became Plaintiffs' loan servicer in or around 2007.

76. Upon information and belief, beginning in or around 2008 through the present, Deutsche Bank has been Plaintiffs' lender.

77. Beginning in or around 2005 until in or around 2008, Plaintiffs purchased the necessary hazard insurance from Farmers, which cost approximately $973 per year.

78. Beginning in or around 2008 until on or about May 17, 2011, Saxon force-placed hazard insurance on Plaintiffs' property, first through Balboa and later, in or around 2010, through ASIC.

79. Upon information and belief, Defendants only force-placed insurance on Plaintiffs' original Mortgage.

80. Beginning in or around March 2008, instead of opting to continue Plaintiffs' previous policy, Saxon force-placed hazard insurance on Plaintiffs' property at an annual premium of approximately $7,341.00 at a coverage amount of $506,250 through Balboa.

81. Beginning in or around 2008, Saxon set up an escrow account for Plaintiffs in order to charge Plaintiffs for the premiums of the FPI.

82. Beginning in or around 2008 and through the present, Defendants continued to charge Plaintiffs for the premiums for FPI through their escrow account.

83. On or about January 15, 2010, Saxon sent Plaintiffs a form letter stating that their "fire/homeowners insurance expired/cancelled" on January 10, 2010 and that Saxon must receive evidence of the continuation of their insurance coverage as soon as possible.

84. On or about February 20, 2010, Saxon sent Plaintiffs a second form letter informing them that Saxon had not received "the renewal insurance policy covering your property" and that their current insurance policy was no longer in effect as of January 10, 2010. The notice further advised Plaintiffs that if they did not have an agent to obtain hazard insurance from, they "may be able to obtain a policy with the required coverages through Assurant Specialty Property. Insurance products offered by Assurant Specialty Property are underwritten through American Security Insurance Company (ASIC) and Standard Guaranty Insurance Company (SGIC)."

85. On or about February 20, 2010, Plaintiffs received an insurance binder from ASIC ("February 2010 ASIC Insurance Binder") notifying Plaintiffs that hazard insurance was force-placed on their Property and backdated to cover the period beginning January 10, 2010 through March 11, 2010, for an annual premium of $3,615.00. The policy's coverage amount was $506,250 and named Saxon as the "Insured Mortgagee" and Plaintiffs as the additional insured. *See* February 2010 ASIC Insurance Binder, attached hereto as Exhibit 15.

86. On or about April 4, 2010, Saxon sent Plaintiffs a third form letter ("Saxon 2010 FPI Notice") informing Plaintiffs that "lender placed coverage has been ordered, and the enclosed policy's annual premium of $3,615.00 has been billed to an impound/escrow account established for your loan." The policy Saxon

force-placed was through ASIC and was backdated to cover the period from January 10, 2010 through January 10, 2011, with a coverage amount of $506,250. *See* Saxon 2010 FPI Notice, attached hereto as Exhibit 16.

87.   The Saxon 2010 FPI Notice further stated that the FPI "will have significantly higher premiums than standard insurance premiums because our carrier has issued the policy without the benefit of normal underwriting guidelines," that the policy "covers only the building," and that Saxon "incurred expenses in placing their policy, as a result we may receive reimbursement for such expenses from the insurance company." *Id.*

88.   The Saxon 2010 FPI Notice was fraudulent, deceptive, and misleading because the FPI premium was not "significantly higher [] than standard insurance premiums because [Saxon's] carrier ha[d] issued the policy without the benefit of normal underwriting guidelines," but because, upon information and belief, Saxon received kickbacks and commission from ASIC pursuant to exclusive purchasing agreements.

89.   Furthermore, Saxon did not incur expenses in placing this policy through ASIC, because, upon information and belief, Saxon already received compensation for its FPI services from its lender agreements and received a kickback through additional "reimbursement [] from the insurance company."

90.   While the premium for the FPI policy was substantially higher than a traditional insurance policy, the policy provided less coverage in that it only covered the structure of the dwelling. *Id.*

91.   While Plaintiffs' Mortgage, a standard form contract, allows the lender to "pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument," and to be reimbursed by the borrower, *see* Mortgage at ¶ 9 (Exhibit 14), the Mortgage does not authorize either the lender or the servicer to require the borrower to obtain hazard insurance in

excess of borrower's outstanding loan balance or in excess of the value of the property. Nor does the Mortgage authorize either the lender or servicer to require the borrower to pay in excess of the net costs of those services in order for the lender, servicer and/or its affiliates to make a profit at the borrower's expense.

92. On or about December 17, 2010, Saxon sent Plaintiffs a form letter stating that Saxon was renewing the FPI policy obtained on Plaintiffs' behalf in approximately 30 days ("Saxon 2010 FPI Renewal Notice"). The Saxon 2010 FPI Renewal Notice stated that the policy will be renewed with a premium of $3,615.00. *See* Saxon 2010 FPI Renewal Notice, attached hereto as Exhibit 17.

93. On or about January 22, 2011, Saxon sent Plaintiffs a form letter ("Saxon 2011 FPI Notice") which enclosed "a renewal policy obtained by, Saxon on your behalf[.]" The letter also stated that "Due to varying replacement costs, the limits provided may not be sufficient to restore the property in the event of a total loss" and that "Saxon has billed your impound/escrow account for the annual premium due of $3,615.00." *See* Saxon 2011 FPI Notice, attached hereto as Exhibit 18.

94. The enclosed FPI policy was from ASIC and was backdated to become effective beginning January 10, 2011 through January 10, 2012. Saxon was the "Named Insured Mortgagee," with Plaintiffs as the "Additional Insured." The policy further stated that the "above Named Insured Mortgagee is authorized to advance all funds to be recovered from the Additional Insured for the insurance afforded." *Id.*

95. While the premium for the FPI policy was substantially higher than a traditional insurance policy, the policy provided less coverage, in that it only covered the structure of the dwelling. *Id.*

96. While Plaintiffs' Mortgage, a standard form contract, allows the lender to "pay for whatever is reasonable or appropriate to protect Lender's interest in the

-24-

Property and rights under this Security Instrument," and to be reimbursed by the borrower, *see* Mortgage at ¶ 9 (Exhibit 14), the Mortgage does not authorize either the lender or the servicer to require the borrower to obtain hazard insurance in excess of borrower's outstanding loan balance or in excess of the value of the property. Nor does the Mortgage authorize either the lender or servicer to require the borrower to pay in excess of the net costs of those services in order for the lender, servicer and/or its affiliates to make a profit at the borrower's expense.

97. On or about April 21, 2011, Plaintiffs received a letter from Saxon ("Saxon Upcoming Change to Loan Servicing Notice") informing them that "[e]ffective on May 16, 2011, the servicing of your mortgage loan will be transferred from Saxon Mortgage Services, Inc. to Ocwen Loan Servicing, LLC." *See* Saxon Upcoming Change to Loan Servicing Notice, attached hereto as Exhibit 19. The Saxon Upcoming Change to Loan Servicing Notice also informed Plaintiffs that "the transfer of the servicing (i.e. our right to receive your loan payments) does not affect any of the terms or conditions of your mortgage other than terms directly related to the servicing of the loan." *Id.*

98. On or about April 23, 2011, Plaintiffs received a notice from ASIC notifying Plaintiffs that their FPI was being canceled effective May 16, 2011 ("ASIC Lender-Placed Insurance Confirmation of Cancellation Notice") because their loan had been transferred to Ocwen and "the mortgagee/lender no longer has an insurable interest in the property." *See* ASIC Lender-Placed Insurance Confirmation of Cancellation Notice, attached hereto as Exhibit 20.

99. On or about October 1, 2011, Ocwen sent Plaintiffs a form letter ("Ocwen 2011 Request for Hazard Insurance") stating that Plaintiffs' hazard insurance expiration date was May 17, 2011, that Ocwen "did not have current hazard insurance information for [Plaintiffs'] account" and that Plaintiffs' "loan agreement requires you to maintain hazard insurance covering your home that is in

effect at all times, in the amounts we require, and protects our interests." The Ocwen 2011 Request for Hazard Insurance further notified Plaintiffs that if Ocwen did not receive proof of adequate insurance, "we may purchase hazard insurance beginning from the date of lapse, based on the amount of coverage you provided on your previous insurance policy, if available, and charge you for the cost of the insurance." *See* Ocwen 2011 Request for Hazard Insurance, attached hereto as Exhibit 21.

100. The Ocwen 2011 Request for Hazard Insurance was fraudulent, deceptive, and misleading because Ocwen did not purchase FPI based on the "amount of coverage you provided your previous insurance policy" but instead, upon information and belief, purchased FPI based on exclusive purchasing agreements with ASIC to receive kickbacks.

101. On or about November 5, 2011, Ocwen sent Plaintiffs a second form letter informing Plaintiffs that Ocwen had not received proof of hazard insurance ("Ocwen 2011 Second FPI Request Notice") and that Ocwen "may purchase hazard insurance beginning from [May 17, 2011], based on the amount of coverage of your previous acceptable hazard insurance policy, if available, and charge you for the cost of the Insurance." The Ocwen 2011 Second FPI Request Notice also stated that the hazard insurance Ocwen will force-place on Plaintiffs will be more expensive than standard hazard insurance because "the insurance we purchased is issued automatically without evaluating the risk of insuring your property." *See* Ocwen 2011 Second FPI Request Notice, attached hereto as Exhibit 22.

102. The Ocwen 2011 Second FPI Request Notice also notified Plaintiffs that:

> Ocwen has secured Insurance on your property for up to sixty (60) days under the policy described in the enclosed Insurance Binder. . . . If you do not give us proof that you have coverage before the end of the binder period, we

> will obtain a one-year policy on your property. . . . Since this policy will insure your property without inspection, the cost of the premium may be much higher than the amount you would normally pay. . . . We have incurred expenses in placing this Insurance Binder and policy. Such expenses are recoverable by us as stated in your loan documents. Part of the policy premium charged to your escrow account may be used by the insurance carrier to reimburse us for these expenses.

*Id.*

103.   The Ocwen 2011 Second FPI Request Notice was fraudulent, deceptive, and misleading because the cost of the premium of the FPI policy Ocwen purchased on Plaintiffs' behalf was not "higher than the amount you would normally pay" because "the policy will insure [Plaintiffs'] property without inspection," but because, upon information and belief, Ocwen received kickbacks and commissions from ASIC pursuant to exclusive purchasing agreements.

104.   Furthermore, Ocwen did not incur expenses in placing this policy through ASIC, because, upon information and belief, Ocwen already received compensation for its FPI services from its lender agreements and received a kickback through additional reimbursement from ASIC of expenses that were already paid for.

105.   On or about December 10, 2011, Ocwen sent Plaintiffs a third form letter notifying Plaintiffs of Ocwen's intent to place insurance on Plaintiffs' property in 30 days ("Ocwen 2011 Notice of Intent to Place Insurance"). The Ocwen 2011 Notice of Intent to Place Insurance also stated that Plaintiffs' escrow account would be charged $3,402.00 for the FPI and that Plaintiffs' "monthly payment may be increased to include the cost of this policy, or you will be billed directly." *See* Ocwen 2011 Notice of Intent to Place Insurance, attached hereto as Exhibit 23.

106.   On or about January 21, 2012, Ocwen sent Plaintiffs a form letter

informing Plaintiffs that Ocwen had force-placed hazard insurance though ASIC ("Ocwen 2012 Notice of FPI") on Plaintiffs' property at an annual premium amount of $3,402.00, with a coverage amount of $506,250. The Ocwen 2012 Notice of FPI stated that the FPI "premium will be charged to your escrow account. If you do not have an escrow account, one may be established, or you will be billed directly. Your monthly payment may be increased to include the cost of this policy." *See* Ocwen 2012 notice of FPI, attached hereto as Exhibit 24.

107.   The FPI policy from ASIC enclosed with the Ocwen 2012 notice also informed Plaintiffs that the policy had been backdated to cover the period beginning on or about May 17, 2011 through May 17, 2012. *Id.*

108.   While the premium for the FPI policy was substantially higher than a traditional insurance policy, the policy provided less coverage, in that it only covered the structure of the dwelling. *Id.*

109.   While Plaintiffs' Mortgage, a standard form contract, allows the lender to "pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument," and to be reimbursed by the borrower, *see* Mortgage at ¶ 9 (Exhibit 14), the Mortgage does not authorize either the lender or the servicer to require the borrower to obtain hazard insurance in excess of borrower's outstanding loan balance or in excess of the value of the property. Nor does the Mortgage authorize either the lender or servicer to require the borrower to pay in excess of the net costs of those services in order for the lender, servicer and/or its affiliates to make a profit at the borrower's expense.

110.   Upon information and belief, beginning in or around 2012, Ocwen sent form letters informing Plaintiffs that their FPI policy was set to expire on May 17, 2012, and that the policy would be renewed if Plaintiffs did not show proof of acceptable insurance coverage.

111.   Upon information and belief, Ocwen force-placed insurance on

Plaintiffs' Property through ASIC at an annual premium of approximately $3,453 and a coverage amount of approximately $506,250 and backdated the policy to begin in or around May 2012.

112. Upon information and belief, while the premium for the FPI policy was substantially higher than a traditional insurance policy, the policy provided less coverage, in that it only covered the structure of the dwelling.

113. While Plaintiffs' Mortgage, a standard form contract, allows the lender to "pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument," and to be reimbursed by the borrower, *see* Mortgage at ¶ 9 (Exhibit 14), the Mortgage does not authorize either the lender or the servicer to require the borrower to obtain hazard insurance in excess of borrower's outstanding loan balance or in excess of the value of the property. Nor does the Mortgage authorize either the lender or servicer to require the borrower to pay in excess of the net costs of those services in order for the lender, servicer and/or its affiliates to make a profit at the borrower's expense.

114. On or about April 27, 2013, Ocwen sent Plaintiffs a notice informing Plaintiffs that their FPI policy was set to expire on May 17, 2013 and would be renewed on the expiration date if Ocwen did not receive proof of acceptable coverage ("Ocwen 2013 Notice of FPI Renewal"). The Ocwen 2013 Notice of FPI Renewal also notified Plaintiffs that the "renewal policy's premium will be $2,469.00 and will be billed to an impound/escrow account established for your loan." *See* Ocwen 2013 Notice of FPI Renewal, attached hereto as Exhibit 25.

115. On or about June 1, 2013, Ocwen mailed Plaintiffs a notice of placement of renewal insurance ("Ocwen 2013 Notice of Placement of Renewal Insurance") informing Plaintiffs that if they did not show proof of acceptable coverage, Ocwen would renew the FPI policy placed on Plaintiffs' property in 2012. Ocwen stated that the previous FPI policy was purchased "because

acceptable proof of coverage was not provided." Furthermore, Ocwen notified Plaintiffs that if the FPI policy was renewed, Ocwen would "charge [Plaintiffs'] escrow account $2,469.00 approximately 30 days from the date of the letter for the renewal premium that is due." *See* Ocwen 2013 Notice of Placement of Renewal Insurance, attached hereto as Exhibit 26.

116. The Ocwen 2013 Notice of Placement of Renewal Insurance was fraudulent, deceptive, and misleading because Ocwen had not purchased the previous year's FPI policy because Plaintiffs failed to provide acceptable proof of coverage, but because, upon information and belief, Ocwen received kickbacks and commissions from ASIC pursuant to exclusive purchasing agreements.

117. On or about July 13, 2013, Ocwen sent Plaintiffs another form letter which enclosed the FPI policy that Ocwen purchased on Plaintiffs' behalf through ASIC ("Ocwen 2013 Notice of FPI") and informed Plaintiffs that the "hazard insurance we purchased will be effective beginning on the date that your previous acceptable insurance expired or was cancelled (regardless of whether or not your policy provided insurance coverage to the owner of your mortgage loan after that date)." *See* Ocwen 2013 Notice of FPI, attached hereto as Exhibit 27.

118. The Ocwen 2013 Notice of FPI further provided that Ocwen "incurred expenses in placing this insurance policy. Such expenses are recoverable by us as stated in your loan documents. Part of the policy premium charged to your escrow account may be used by the insurance carrier to reimburse us for these expenses." *Id.*

119. The Ocwen 2013 Notice of FPI was fraudulent, deceptive, and misleading because Ocwen did not incur expenses in placing this policy through ASIC, because, upon information and belief, Ocwen already received compensation for its FPI services from its lender agreements and received a kickback through additional reimbursement from ASIC of expenses that were

already paid.

120. The FPI policy through ASIC enclosed with the Ocwen 2013 Notice of FPI evidenced that the FPI policy was backdated to cover the period beginning on or about May 17, 2013 through May 17, 2014, with an annual premium of approximately $2,469 and a coverage amount of $528,745. *Id.*

121. While the premium for the FPI policy was substantially higher than a traditional insurance policy, the policy provided less coverage, in that it only covered the structure of the dwelling. *Id.*

122. While Plaintiffs' Mortgage, a standard form contract, allows the lender to "pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument," and to be reimbursed by the borrower, *see* Mortgage at ¶ 9 (Exhibit 14), the Mortgage does not authorize either the lender or the servicer to require the borrower to obtain hazard insurance in excess of borrower's outstanding loan balance or in excess of the value of the property. Nor does the Mortgage authorize either the lender or servicer to require the borrower to pay in excess of the net costs of those services in order for the lender, servicer and/or its affiliates to make a profit at the borrower's expense.

123. In or around August 2013, Plaintiffs entered into a commitment to modify their Mortgage and to process a Partial Claim with Ocwen ("Loan Modification"). Plaintiffs paid $2,130.91 in consideration for the Loan Modification on or about October 7, 2013.

124. As a result of the Loan Modification, Plaintiffs' principal balance lowered to $448,400.00. This post-modification balance includes costs attributable to kickbacks and other unearned compensation associated with Servicing Defendants' pre-modification conduct as alleged herein.

125. Plaintiffs made the required monthly payments of $2,130.91 to Ocwen pursuant to the terms of the Loan Modification between at least October 2013 and

March 2014.

126. Upon information and belief, despite Plaintiffs' new lower principal balance, Ocwen maintained the FPI on Plaintiffs' Property at the same amount ($528,745), or approximately $80,345 more than the indebtedness on Plaintiffs' loan.

127. Upon information and belief, Plaintiffs' Loan Modification did not affect the terms of Plaintiffs' Mortgage pertaining to hazard insurance and Ocwen's right to force-place insurance.

128. The amount of coverage Ocwen force-placed on Plaintiffs' Property greatly exceeded Ocwen's interest in the Property, in that it exceeded the outstanding principal balance on the loan.

129. On or about September 18, 2013, Plaintiffs' Second Mortgage was assigned to Nationwide Credit, Inc. for collection. The remaining balance on the Second Mortgage was approximately $239,016.51.

**Defendants' FPI Operations**

130. The notification letters Servicing Defendants sent to Plaintiffs and Class members contained the caveat that Servicing Defendants would receive compensation for "incurred expenses in placing this Insurance Binder and policy." This statement and the notification letters were objectively false and misleading because they failed to disclose, *inter alia*: (a) Servicing Defendants at the time had preexisting agreements with ASIC that guaranteed Servicing Defendants would receive compensation from ASIC, including kickbacks; (b) under those agreements, Servicing Defendants were not compensated for ***the placement of the individual policies or certificates,*** but rather were compensated for agreeing to enter into exclusive FPI and outsourcing agreements with ASIC; and (c) the compensation paid to Servicing Defendants, including the kickbacks paid to them by ASIC, was at borrowers' expense. At no time did Plaintiffs or Class members

know about or authorize these acts.

131. As alleged below, as part of Defendants' scheme, Servicing Defendants forced-placed hazard insurance pursuant to an exclusive purchasing agreement with ASIC.

132. Upon information and belief, Servicing Defendants entered into exclusive purchasing agreements with ASIC pursuant to which Servicing Defendants would act as the "broker" or "agent" for FPI policies purchased on behalf of Servicing Defendants' borrowers and would receive a guaranteed commission equal to a percentage of the premium for each policy.

133. Servicing Defendants, however, performed no acts either as a broker or agent for ASIC. Instead, upon information and belief, although the notices that Plaintiffs received about hazard insurance were printed on Servicing Defendants' letterhead, it was actually ASIC, acting for Servicing Defendants, that monitored Plaintiffs' hazard insurance coverage and initiated the notices demanding proof of insurance and, ultimately, force-placed the additional insurance on Plaintiffs and the members of the Class.

134. Although Servicing Defendants informed Plaintiffs and Class members that they may receive "compensation" related to the FPI policy, they did not inform Plaintiffs or Class members that they were bearing the cost of that compensation or that the compensation was not paid in exchange for *bona fide* services, but instead was paid in connection with Servicing Defendants agreeing to enter into exclusive purchasing agreements with ASIC in exchange for, *inter alia*, kickbacks.

135. Servicing Defendants would charge the escrow accounts of the Class members for the premium for the FPI, as they did to Plaintiffs, or would add the premiums to the borrower's indebtedness, and ASIC would then kick back a percentage of the premiums to Servicing Defendants as a commission.

136.  The kickbacks, commissions, and other compensation that Servicing Defendants received in connection with FPI were thus not legitimately earned and came at the ultimate expense of its customers who had insurance force-placed on them.

137.  It is well established that an insurance contract is void if the named insured lacks an insurable interest in the property covered under the contract. A lender's insurable interest in the loan collateral is the outstanding loan balance; accordingly, a lender's insurable interest in the mortgaged property is the outstanding loan balance on the mortgage.

138.  Servicing Defendants' practices, acting in concert with ASIC and/or other insurers, of profiting from the force-placement of insurance policies, tend to keep charges for FPI artificially inflated over time because a percentage of the charges assessed to borrowers are not actually being paid to cover actual risk. Instead, Servicing Defendants and ASIC conspired to assess charges unrelated to the legitimate protection of lender's interest in the property of borrowers whose policies were force-placed. Amounts paid to servicers and their affiliates as below-cost portfolio monitoring and tracking services and expense reimbursements have become a part of the cost of doing business for FPI providers.

139.  As a result of Defendants' misrepresentations and deceptive acts, and their unlawful hazard insurance practices, Plaintiffs and the Class have incurred unnecessary and excessive expenses not related to the provision of force-placed hazard insurance. In addition, Servicing Defendants have been unjustly enriched by the kickbacks, commissions, or other compensation that ASIC paid them in connection with the Plaintiffs' hazard insurance.

**Government Response to Mortgage Lender and Servicer FPI Practices**

140.  FPI practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government

investigations prompted by concerns that consumers are being gouged when they are force-placed into insurance following a lapse in their policies. *See Under Interrogation*, (Exhibit 4); Gretchen Morgenson, *Hazard Insurance With Its Own Perils*, N.Y. TIMES (Jan. 21, 2012), http://www.nytimes.com/2012/01/22/business/hazard-insurance-with-its-own-perils-fair-game.html?_r=0, attached hereto as Exhibit 28; *see also* Louise Story, *Big Banks Face Inquiry Over Home Insurance*, N.Y. TIMES (Jan. 10, 2012), http://www.nytimes.com/2012/01/11/business/big-banks-facing-inquiry-over-possible-insurance-fraud.html?_r=0, attached hereto as Exhibit 29.

141. State attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning FPI. Recently, a coalition of 49 state attorneys general entered into a historic joint state-federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com/ (official website established by the government relating to the settlement); *see also* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, AM. BANKER (Mar. 10, 2011), http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html.

142. Among other terms, the National Mortgage Settlement essentially prohibits servicers from profiting from FPI. Specifically, under the National Mortgage Settlement, mortgage servicers: (a) shall not obtain FPI unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless

of homeowner payment; and (e) must purchase the FPI for a commercially reasonable price. *Id.*; *see also Consent Judgment, United States of America v. Bank of America Corp.*, No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) [ECF No. 14 Section VII].

143. Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry—which also had a relatively low level of losses—as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. *See*, *e.g.*, Broderick Perkins, *Title Insurance Industry in Hot Water with Regulators Again*, SILICON VALLEY BUS. J. (May 22, 2005, 9:00pm PDT), http://www.bizjournals.com/sanjose/stories/2005/05/23/story4.html?page=all.

144. Indeed, while announcing a $37.8 million settlement with nine title insurers, then Florida Insurance Commissioner John Garamendi stated, "This reinsurance scheme appears to be nothing more than a form of commercial bribery." As a result, a number of providers have abandoned such arrangements altogether. *See* Annette Haddad, *3 Title Firms Settle Claims*, L.A. TIMES (July 20, 2005), http://articles.latimes.com/2005/jul/21/business/fi-title21.

145. Fannie Mae has changed its policies so as to curb bank and servicers' improper practices. Fannie Mae issued a Service Guide Announcement on March 14, 2012, "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements, and allowable reimbursable expenses for lender-placed insurance" for servicers of the loans it holds. The Fannie Mae guidelines seek to eliminate the abuses prevalent in the FPI industry, including requiring that the cost of FPI be "competitively priced" and "commercially reasonable" and must exclude: (1) any lender-placed insurance commission earned on that policy by the servicer or any related entity; (2) costs associated with insurance tracking or administration; (3) or any other costs beyond

the actual cost of the lender-placed insurance policy premium. *See* Fannie Mae Servicing Guide Announcement SVC-2012-04, attached hereto as Exhibit 30.

146. The NYSDFS's hearings on FPI resulted in government action and findings that borrowers were overcharged for FPI. On June 12, 2012, Governor Cuomo's website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance." It stated:

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing. Also, DFS discovered that the force-placed insurance market lacks the sort of competition that would keep premiums down. In New York, two companies have 90 percent of the market. In addition, the hearings made clear that high force-placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

*See* http://www.governor.ny.gov/press/06122012DFS, attached hereto as Exhibit 31.

147. The relatively low level of losses associated with FPI indicates that reinsurance with captives is also unnecessary. For example, during 2009, one insurer collected approximately $2.7 billion of premiums through its Specialty Insurance Division, which is overwhelmingly devoted to FPI. Notably, this insurer paid out only 36% of this amount in claims, though in the company's other lines of business a 70% claims-to-premiums ratio is the norm. Not surprisingly, far from being an excessive risk, FPI is actually this insurer's most profitable product. *Id.* Birny Birnbaum, in his testimony before the New York Attorney General, presented statistics collected by the NAIC reflecting nationwide loss ratios for lender-placed hazard insurance during the 2004-2011 period as being, on average, more than 35 points lower than the ratios for commercially available homeowners

policies. *See* Birnbaum NYSDFS Testimony at 9 (Exhibit 9). When confined to the period from 2007-2011, the disparity between lender-placed hazard insurance loss ratios and those of commercially available homeowners policies was nearly 42 points. *Id.*

148. On or about March 21, 2013, Governor Cuomo announced that a NYSDFS investigation produced a New York settlement with Assurant. *See* March 21, 2013 Press Release, attached hereto as Exhibit 32.

149. The NYSDFS's investigation into Assurant and its subsidiaries, including ASIC, revealed that:

> In some cases, ASIC and ABIC pay commissions to insurance agencies and brokers that are affiliates of mortgage servicers. Typically, the commissions are ten to twenty percent of the premium written on the servicer's mortgage loan portfolio, a percentage that is in line with standard property and casualty commissions. The evidence from the Investigation indicates that the affiliated agencies and brokers do little or no work for the commissions ASIC and ABIC pay them. ASIC, ABIC and their affiliates do much of the work associated with force-placed insurance, including tracking insurance coverage and communicating with homeowners. These arrangements could create an incentive for mortgage servicers to purchase higher priced force-placed insurance and for mortgage servicers to place more homeowners into force-placed insurance, because their affiliates earn more commission as premiums increase.
>
> ASIC has also entered into quota share reinsurance arrangements with mortgage servicers' captive reinsurers under which the captive reinsurer receives a percentage of the premium and assumes the same percentage of risk. Because of the low loss ratios for force-placed hazard insurance, such reinsurance arrangements have been highly profitable for servicers.

> While servicers maintain that they are interested in ensuring that their homeowner customers' claims are property handled, the reinsurance arrangements could create an incentive for servicers to refrain from submitting claims and to delay or inhibit the claims process, because their affiliated reinsurers earn more when claims are not paid.
>
> ASIC pays some mortgage servicers what it characterizes as the servicers' "qualified expenses" related to force-placed insurance. These payments are typically an amount capped at a percentage of the premium force placed on the servicer's portfolio and appear to be substitutes for commissions[.]

*See* ASIC Consent Order, attached hereto as Exhibit 33.

150. On or about December 19, 2013, the Consumer Financial Protection Bureau ("CFPB"), authorities in 49 states, and the District of Columbia filed a proposed court order requiring that Ocwen provide $2 billion in principle reduction to underwater borrowers. The consent order addressed every stage of the mortgage servicing process, requiring Ocwen to refund $125 million to approximately 185,000 borrowers who were foreclosed upon. *See* CFPB, State Authorities Order Ocwen to Provide $2 Billion in Relief to Homeowners for Servicing Wrongs (Dec. 19, 2013), *available at* http://www.consumerfinance.gov/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-billion-in-relief-to-homeowners-for-servicing-wrongs/, attached hereto as Exhibit 34.

151. According to the complaint filed by the CFPB in federal court, Ocwen's violations of consumer protection laws put thousands of people across the country at risk of becoming homeless and violated the law in a number of ways including by, among other things, imposing FPI on borrowers when Ocwen knew or should have known that they already had adequate home-insurance coverage in place. *Id.*

152.   As stated by the CFPB director, Richard Cordray:

> Ocwen took advantage of borrowers at every stage of the process. Today's action sends a clear message that we will be vigilant about making sure that consumers are treated with respect, dignity, and fairness they deserve.

*Id.*

**Defendants' FPI Policies and Practices Provide Unearned and Unjustified Profits and Kickbacks To Defendants**

153.   As *American Banker* observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers (Exhibit 8). These costs are ultimately paid by the borrowers.

154.   Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher, implying paydays for servicers amounting to hundreds of millions of dollars per year. *See* Birnbaum Florida Testimony (Exhibit 1).

155.   Moreover, on information and belief, the charges that Defendants chose to impose upon borrowers for FPI also unlawfully included the cost of portfolio monitoring and tracking services for Defendants' entire loan portfolio, the cost of which was then passed onto the small percentage of borrowers whose properties were force-placed. *See id.*

156.   Unjustified fees which amount to kickbacks also inflate the premiums of FPI:

> The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the

> policyholder's needs while seeking the most competitive price for the product. Such activities simply do not exist in [FPI] because there are only two national providers of the necessary package of insurance and related services and there is no price competition among the insurers. Soliciting new business consists of asking typically two venders for proposals – and such activity is a rare event for most servicers.

*Id.*

157. Defendants' practices of unlawfully profiting from force placing insurance policies tend to keep premiums for FPI artificially inflated over time because a percentage of borrowers' premiums are not being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers and their affiliates as commissions and reinsurance premiums have become a part of the cost of doing business for FPI providers. As a result, FPI premiums incorporate the payment of such kickbacks—to the detriment of consumers.

158. Defendants' conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of FPI is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects [a] bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See* Ties to Insurers (Exhibit 8).

## CLASS ACTION ALLEGATIONS

159. Plaintiffs assert their claims on behalf of the following proposed Class:

> All persons who have or had a residential mortgage loan or line of credit owned, originated or serviced by Defendants secured by property located in California and, in connection therewith, were charged for "force-placed" hazard insurance on the secured property within the applicable statute of limitations. The Class excludes

any judge or magistrate assigned to this case, Defendants and any entity in which Defendants has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

160. <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Class includes hundreds, and likely thousands, of Defendants' customers.

161. <u>Typicality</u>: Plaintiffs' claims are typical of the members of the putative Class, as demonstrated by at least the following facts: (1) Plaintiffs' loan and mortgage documents are typical of those of other Class members; (2) the form hazard insurance notice letters Plaintiffs received were typical of those received by other Class members; (3) pursuant to uniform policies and practices, Defendants treated Plaintiffs consistent with other Class members; (4) Defendants also, as they did for Plaintiffs, required borrowers to purchase and maintain hazard insurance in amounts exceeding those required by their mortgages and greater than required to insure the amount of funds extended, without any reasonable basis or justification; (5) it was typical for Servicing Defendants to accept kickbacks, commissions, or other compensation in connection with hazard insurance; (6) Defendants' hazard insurance requirements are the same for all borrowers, regardless of individual circumstances; and (7) Defendants' form letters informing borrowers of these requirements are the same or substantially similar for all borrowers.

162. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class, and have retained counsel experienced in complex class action litigation. Plaintiffs have no interests which are adverse to those of the Class that they seek to represent.

163. <u>Commonality</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting

individual members of the Class, including:

(a) Whether Servicing Defendants received financial benefits from ASIC and/or other insurers in the form of insurance monitoring, tracking and processing services;

(b) Whether Defendants' FPI policies were provided by an affiliated entity;

(c) Whether Servicing Defendants received unauthorized and illicit payments in connection with FPI that were unrelated to a *bona fide* service in connection with the FPI and its purpose;

(d) Whether Servicing Defendants received payments in connection with FPI that exceeded the value of any services actually performed or that were otherwise commercially unreasonable;

(e) Whether the mortgage documents relied upon by Servicing Defendants authorize Servicing Defendants to demand and/or force hazard insurance in amounts greater than necessary to secure the amount of funds borrowed;

(f) Whether Defendants' form letters misrepresent applicable hazard insurance requirements to borrowers;

(g) Whether Ocwen breached its contracts with customers by demanding and force placing excessive amounts of hazard insurance or amounts that were not truthfully disclosed in such contracts;

(h) Whether Ocwen owes its customers a duty of good faith and fair dealing and whether Ocwen breached this duty by accepting kickbacks pursuant to exclusive purchasing agreements with insurance companies and/or by requiring hazard insurance in amounts greater than the principal balance

of Plaintiffs' loan, despite the mortgage limiting force placement to this amount;

(i)    Whether Defendants' conduct constituted a violation of the California Business & Professions Code §§ 17200, *et seq.*;

(j)    Whether ASIC was unjustly enriched by the conduct described in this Amended Complaint;

(k)    Whether Defendants' conduct described in this Amended Complaint violates state law, as alleged in this Amended Complaint;

(l)    The appropriateness and proper form of any declaratory or injunctive relief; and

(m)    The appropriateness and proper measure of compensatory damages, statutory damages, restitution, and/or other monetary relief.

164.  These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

165.  Plaintiffs are members of the Class and will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of this litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

166.  Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of

conduct for Defendant.

167.  Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

168.  Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

169.  Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

170.  Plaintiffs reserve their right to modify or amend the definition of the proposed Class at any time before the Class is certified by the Court.

## FIRST CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
**(California Business and Professions Code §§ 17200, *et seq.*)**
**(ASSERTED AGAINST ALL DEFENDANTS)**

171.  Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

172.  Plaintiffs bring this claim on behalf of themselves and the proposed Class.

173.  Plaintiffs assert this claim against all Defendants.

174.  California Business and Professions Code §§ 17200, *et seq.*, prohibits

acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

175. Defendants engaged in unfair, unlawful or fraudulent business acts and practices in violation of California Business and Professions Code §§ 17200, *et seq*., in that: (a) Defendants' practices and conduct are immoral, unethical, oppressive and substantially harmful to Plaintiffs and the members of the Class; (b) the justification for Defendants' practices and conduct is outweighed by the gravity of the injury to Plaintiffs and the Class; and (c) Defendants' practices constitute unfair, fraudulent, untrue or misleading actions in that such conduct is likely to deceive and, in fact, did deceive members of the public.

176. Defendants' unlawful, unfair, and/or fraudulent business practices are described herein and include, without limitation:

> (a) Servicing Defendants failed to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead, forced borrowers to pay for insurance policies from Defendant's exclusive FPI providers, including ASIC, for the sole purpose of maximizing their own profits. These policies were the result of, *inter alia*, kickback arrangements that needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies or other policies priced at commercially reasonable rates;

> (b) Servicing Defendants used their discretion to choose an FPI provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

> (c) Servicing Defendants failed to seek competitively priced

insurance on the open market and instead selected FPI providers according to pre-arranged secret deals, accompanied by kickbacks and other improper compensation, whereby the insurance policies are continually purchased through the same companies;

(d) Defendants assessed excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiffs and the Class that were the direct result of kickback and other self-serving arrangements, and they misrepresented and failed to disclose the reason for the cost of the policies;

(e) Defendants backdated FPI policies to cover time periods which had already passed and for which there was already absolutely no risk of loss;

(f) Defendants misrepresented in their FPI notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a "standard mortgage clause" and/or the lender's Loss Payable Endorsement;

(g) Defendants misrepresented that the mortgage contract authorized their conduct;

(h) Defendants misrepresented and failed to disclose the true reasons for the high cost of the FPI;

(i) Servicing Defendants procured FPI policies to cover time periods during which the mortgagee is already covered pursuant to a lender's Loss Payable Endorsement;

(j) Servicing Defendants failed to provide borrowers with any opportunity whatsoever to opt out of having their FPI policies provided by an insurer with whom Servicing Defendants had an

affiliate relationship or commission arrangement;

(k) Defendants imposing unjustified, unauthorized and improper costs upon borrowers and thereby wrongfully depleted their funds, increased their indebtedness and/or depleted their equity in their property; and

(l) Defendants engaged in other unfair and/or unlawful conduct as described in this Amended Complaint.

177. The foregoing acts and practices have detrimentally impacted competition and caused substantial harm to Plaintiffs and the Class. Plaintiffs have suffered financial injuries in fact to their business or property as a result of Defendants' conduct. As alleged above, such injuries were not reasonably avoidable. Defendants' improper acts were the result of secretive agreements that were neither disclosed to, nor authorized by, Plaintiffs and Class members.

178. By reason of the foregoing, Defendants should be required to pay damages in an amount to be proven at trial, disgorge their illicit profits and/or make restitution to Plaintiffs and the Class, and/or be enjoined from continuing in such practices pursuant to §§ 17203 and 17204 of the California Business and Professions Code.

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT, INCLUDING IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (ASSERTED AGAINST OCWEN)

179. Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

180. Plaintiffs bring this claim on behalf of themselves and the Class.

181. Plaintiffs assert this claim against Ocwen.

182. When the original lender transferred or assigned Plaintiffs' loan and mortgage to Ocwen, Ocwen could take no more rights than the original lender had.

183.  Ocwen is bound by the terms of Plaintiffs' Mortgage.

184.  Ocwen has serviced loans governed by substantially similar standard form notes and mortgage contracts.

185.  Every contract contains an implied covenant of good faith and fair dealing.

186.  Ocwen acted on its own behalf and as the duly authorized agent of the owner or assignee of the mortgage agreements of Plaintiffs and the members of the Class. Ocwen was contractually obligated to service the loans of Plaintiffs and the members of the Class pursuant to the terms of their mortgage agreements.

187.  The mortgage contracts of Plaintiffs and the members of the Class contained an implied covenant of good faith and fair dealing pursuant to which Ocwen was bound to exercise the discretion afforded it under the mortgage contract in good faith and to deal fairly with Plaintiffs and the members of the Class in that regard. Ocwen is not allowed to evade the spirit of the mortgage contract by exercising the discretion afforded it under the mortgage to force-place insurance in a manner abusive to borrowers.

188.  Any discretionary authority granted to Ocwen under the terms of Plaintiffs' and the Class members' mortgage contracts were subject to Ocwen's implied duty of good faith and fair dealing. Accordingly, to the extent that the mortgage contracts of Plaintiffs and the Class members permitted Ocwen to unilaterally "force-place" insurance, Ocwen was obligated not to exercise its discretion to do so in bad faith for its own financial gain for the purposes of maximizing profits at borrowers' expense.

189.  Ocwen breached its duties of good faith and fair dealing in at least the following respects, among others:

(a) Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing

Ocwen's own profits—forcing borrowers to pay for insurance policies from providers of Ocwen's choice. These policies were the direct result of kickback and other self-serving arrangements and needlessly came with substantially greater premiums and less coverage than borrowers' existing policies, while providing an improper financial benefit to Ocwen and/or its affiliates;

(b) Using its discretion to choose an FPI provider and policy in bad faith and in contravention of the parties' reasonable expectations by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c) Failing to seek competitively priced insurance on the open market and instead selecting FPI providers according to pre-arranged secret deals, accompanied by kickbacks and other improper compensation, whereby the insurance policies were continually purchased through the same companies; and

(d) Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiffs and the Class members and misrepresenting and failing to disclose the reason for the cost of the policy.

190.  Further, to the extent that the mortgage contracts of Plaintiffs and the Class permitted Ocwen to unilaterally "force-place" insurance, Ocwen was contractually permitted to do so only to the extent required to reasonably protect the value of the property and the mortgagee's interest in the secured property.

191.  Ocwen was also prohibited from charging borrowers for holding and applying escrow funds when paying for FPI on their behalf. *See* Mortgage (Exhibit 14), at 4-5.

192.  Nonetheless, Ocwen has imposed or collected amounts that exceeded or were unrelated to the amounts required to protect the value of the property and the mortgagee's interest in the property as a result of, *inter alia*, Ocwen's kickback and other self-serving arrangements with FPI providers. Such practices have included, without limitation, requiring borrowers to pay for insurance coverage

that exceeds or is unrelated to the amount necessary to protect the value of the property or mortgagee's interest in the secured property.

193.  By force-placing insurance that goes well beyond the pale of what is required or related to protecting its interests or the property value, Ocwen has breached express contractual obligations owed to Plaintiffs and the members of the Class.

194.  As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing and the express terms of the mortgage contracts, Plaintiffs and the members of the Class have suffered damages and are entitled to the relief sought herein for such breaches of contract.

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT/DISGORGEMENT
### (ASSERTED AGAINST ASIC)

195.  Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

196.  Plaintiffs bring this claim on behalf of themselves and the Class.

197.  Plaintiffs assert this claim against ASIC.

198.  ASIC has been unjustly enriched as a result of the conduct described in this Amended Complaint.

199.  By providing unnecessary and exorbitantly priced FPI policies on the properties of Plaintiffs and the members of the Class pursuant to exclusive provider agreements between Servicing Defendants and ASIC, Servicing Defendants collected kickbacks and commissions from ASIC.

200.  These payments were accepted and retained by Servicing Defendants.

201.  Servicing Defendants did not provide services in connection with the FPI policies. Instead, upon information and belief, ASIC monitored Plaintiffs and Class members' insurance and sent out the notices that Plaintiffs and Class

members received.

202.  These commissions were not earned, but were obtained as a result of the unlawful conduct described in this Amended Complaint, at the expense of Plaintiffs and other Class members.

203.  Federal law only allows lenders and servicers to "charge the borrower for the cost of premiums and fees *incurred* by the lender or servicer for the loan in purchasing the insurance." 42 U.S.C. § 4012(e)(2); *see also* 12 C.F.R. § 22.3.

204.  ASIC has been unjustly enriched by obtaining the exclusive FPI business of Servicing Defendants pursuant to secret dealing whereby the prices of ASIC's FPI premiums included kickback amounts and other unnecessary charges and commissions disguised as legitimate costs of the FPI policy.

205.  This exclusive FPI business, and the monies earned therefrom, were accepted and retained by ASIC.

206.  Retention of these benefits by ASIC would be unjust and inequitable.

207.  As a result of ASIC's unjust enrichment, Plaintiffs and the other Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of ASIC's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and wrongful conduct alleged above.

**FOURTH CLAIM FOR RELIEF**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(ASSERTED AGAINST ALL DEFENDANTS)**

208.  Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

209.  On each cause of action stated above, Plaintiffs and the Class will be irreparably injured in the future by Defendants' misconduct.

210.  Plaintiffs, on behalf of themselves and all members of the Class, seek a judgment declaring that Defendants must cease the activities described herein,

provide the Class with adequate remedies, including, without limitation, refunds and/or credits of all unfair, unlawful or otherwise improper FPI charges, including charges reflecting kickbacks and other improper compensation, and provide for adequate procedures and policies to ensure that Defendants' unlawful conduct does not continue. Such policies and procedures should include, without limitation, that Defendants: (a) are prohibited from force-placing insurance when the Defendant knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) cannot force-place insurance that is in excess of the lender's interest in the mortgaged property; (c) are prohibited from purchasing the FPI from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d) must make reasonable efforts to continue or reestablish the borrower's *existing* insurance policy if there is a lapse in payment; and (e) must purchase any FPI for a commercially reasonable price that does not include kickbacks and other compensation arising from improper conduct alleged herein.

## **PRAYER FOR RELIEF**

211. WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief as follows:

    A.    Determining that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure;

    B.    Designating Plaintiffs as the Class representatives;

    C.    Designating Plaintiffs' counsel as counsel for the Class;

    D.    Issuing proper notice to the Class at Defendants' expense;

    E.    Declaring that Defendants' conduct violated California's Unfair Competition Law;

    F.    Declaring that Ocwen's conduct as alleged herein breached the terms of the mortgage contracts and the implied covenant of

good faith and fair dealing;

G.   Declaring that ASIC's conduct as alleged herein was inequitable and that ASIC was unjustly enriched by its conduct;

H.   Declaring that Defendants acted willfully in deliberate or reckless disregard of applicable law and the rights of Plaintiffs and the Class as alleged herein;

I.   Awarding appropriate equitable relief, including restitution and an injunction requiring Defendants to reverse all unlawful, unfair, or otherwise improper charges for hazard insurance coverage, allowing customers to close loans without first paying premiums for hazard insurance that were not necessary or required by law, prohibiting Defendants from imposing unfair and unlawful hazard insurance requirements on borrowers, prohibiting Defendants from earning commissions or other compensation for themselves or affiliated entities on force-placed hazard insurance policies, and requiring Defendants to cease and desist from engaging in further unlawful conduct in the future;

J.   Awarding actual damages, statutory damages, punitive damages, and interest;

K.   Awarding reasonable attorneys' fees and costs to the full extent permitted by law; and

L.   Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

212. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs and the Class demand a trial by jury.

Dated: October 14, 2014

Respectfully submitted,

By: /s/ Rose F. Luzon

ROSE F. LUZON (SBN 221544)
VALERIE CHANG (SBN 295147
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
11755 Wilshire Blvd.
Los Angeles, CA  90025
Telephone: (310) 479-0944
Facsimile: (866) 300-7367
Email: rluzon@sfmslaw.com
          vchang@sfmslaw.com

RONALD S. KRAVITZ (SBN 129704)
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
One California St., Suite 900
San Francisco, CA 94111-5401
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: rkravitz@sfmslaw.com

STEPHEN J. FEARON, JR.
**SQUITIERI & FEARON, LLP**
32 East 57th St., 12th Floor
New York, New NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL